[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Dominick J. Caruso, James M. Anderson, Victor Scaringe and Anita Scaringe, appeal from the decision of the defendant, the planning commission of the city of Meriden (commission), approving the site plan application of the defendant, Community Village, LLC, for the construction of 36 residential units on a 12.44 acre property located at 4 Sam's Road in Meriden, Connecticut. Caruso is the director of development and enforcement in the city of Meriden and his duties include zoning enforcement and planning. Anderson is the zoning enforcement officer and environmental planner for the city of Meriden. The Scaringes, owners of property which abuts the subject property, also filed a verified notice of intervention with the commission pursuant to General Statutes § 22a-19[1] to intervene as a party to the proceeding on the site plan application.[2]
On April 18, 2000, Community Village, LLC, filed an application with the commission for a site plan certificate of approval for 36 multi-family residential units in nine buildings on a 12.44 acre property known as Cathole Mountain on Sam's Road in Meriden. A similar site plan application filed in 1994, which proposed the construction of 36 multi-family residential units on the same property, was denied by the commission in 1995. The subject property is zoned as a Planned Development District (PDD) under the Meriden zoning regulations and is located within the town's "Ridgeline Protection Zone." (Appeal, ¶ 6.) The earlier plan proposed to eliminate more than 100 feet of an existing ridge located on the property by excavating more than 625,000 cubic yards of trap rock from the ridge. Summitwood Associates Phase IVv. Planning Commission, Superior Court, judicial district of New Haven, Docket No. CV 95 371972 (June 6, 1996, Booth, J.). The present plan proposed to eliminate more than 90 feet of the ridge by excavating more than 600,000 cubic yards of rock. (Return of Record (ROR), Item #33, pp. 6 and 57.) Public hearings on the application were held on May 10, 2000 and on June 1, 2000. At the conclusion of the June 1, 2000 hearing, the commission voted to approve the application. CT Page 15245
Presently before the court is the plaintiffs' appeal of the commission's approval of the application. As grounds for the appeal, the plaintiffs allege that the commission acted arbitrarily, illegally and in abuse of its discretion in the following ways: (1) the commission, having previously denied a site plan for the property that was substantially similar, if not identical, to the applicant's proposed plan in all material respects, was not legally permitted to reverse its prior decision; (2) the plan violates several sections of the Meriden zoning regulations; (3) the applicant failed to present information required by the regulations, including a traffic study, soil and erosion control plans, storm drainage data, descriptions of construction phasing, a loading and staging plan, a landscaping/relocation plan, inventory of significant flora and fauna including all existing trees covering 12" in diameter, data regarding soil types, data regarding existing water tables, information on use and storage of explosives, dust control and street cleaning information; (4) the various drawings depicting the development plan included errors and inconsistencies regarding proposed and existing site grades; and (5) the record does not support the environmental determination and the decision. (Appeal, ¶ 14.)
General Statutes § 8-8 governs appeals taken from the decisions of a zoning commission to the superior court. "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.)Bridgeport Bowl-O-Rama v. Zoning Board of Appeals, 195 Conn. 276, 283,487 A.2d 559 (1985).
"[P]leading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved." (Citations omitted; internal quotation marks omitted.) Harris v. ZoningCommission, 259 Conn. 402, 409, 788 A.2d 1239 (2002). The burden of proving aggrievement rests with the plaintiff. Quarry Knoll II Corp. v.Planning Zoning Commission, 256 Conn. 674, 701, 780 A.2d 1 (2001). "Aggrievement falls within two broad categories, classical and statutory." Cole v. Planning Zoning Commission, 30 Conn. App. 511,514, 620 A.2d 1324 (1993), aff'd on remand, 40 Conn. App. 501, 671 A.2d 844
(1996); see also Zoning Board v. Planning Zoning Commission,27 Conn. App. 297, 300, 605 A.2d 885 (1992). "Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." Lewis v. Planning ZoningCT Page 15246Commission, 62 Conn. App. 284, 288, 771 A.2d 167 (2001).
"In the case of a decision by a . . . planning and zoning commission . . . `aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board." General Statutes § 8-8 (a)(1). Additionally, "[t]o further its goal of protecting the environment, the EPA waives the traditional aggrievement requirement in . . . § 22a-19, [which] authorizes any citizen or other entity, without having to first establish aggrievement, to intervene in an existing proceeding."Hyllen-Davey v. Plan Zoning Commission, 57 Conn. App. 589, 593,749 A.2d 682, cert. denied, 253 Conn. 926, 754 A.2d 796 (2000).
At the June 19, 2002 hearing on the plaintiffs' appeal, the Scaringes offered a map and the deed to their property as evidence of their ownership of property abutting the subject property. (Exhibits A C.) Moreover, as previously noted, the Scaringes also filed a verified notice of intervention with the commission pursuant to General Statutes § 22a-19 to intervene as a party to the proceeding on the site plan application. (ROR, Item #15.) Accordingly, the court finds that the Scaringes are statutorily aggrieved both as abutting landowners and for the purpose of appealing the commission's decision on their environmental claims.
General Statutes § 8-8 (b) provides, in part, that an "appeal shall be commenced by service of process in accordance with subsections (e) and (f) [now subsections (f) and (g)] of this section within fifteen days from the date that notice of the decision was published as required by the general statutes." Subsection (e) [now subsection (f)] further provides that service "shall be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality."
Notice of the commission's decision was published in the Meriden Record Journal on June 14, 2000. (ROR, Item #2.) This appeal was commenced on June 21, 2000, by service of process upon Irene Masse, city clerk for the city of Meriden, upon Roger DeZinno, chairman of the Meriden planning commission, and upon James Vitale, agent of the defendant, Community Village, LLC. (Marshall's Return.) The court finds, accordingly, that the present appeal was commenced in a timely fashion upon the proper parties.
In ruling upon a site plan application "a planning and zoning board acts in an administrative capacity. . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and CT Page 15247 consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The . . . trial court . . . decides whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . ." (Citations omitted; internal quotation marks omitted.) Irwin v.Planning Zoning Commission, 244 Conn. 619, 627-28, 711 A.2d 675
(1998). "In applying the law to the facts of a particular case, the board is endowed with a liberal discretion and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Internal quotation marks omitted.) Id., 628. When "the zoning commission does state the reasons for its action, the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations which the commission is required to apply under the zoning regulations." Id., 629. Concerning factual questions "a reviewing court cannot substitute its judgment for that of the agency. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Citations omitted; internal quotation marks omitted.) Id.
The plaintiffs appeal on the ground that the commission, in approving the site plan application, illegally reversed a prior decision. (Plaintiffs' Brief, p. 14.) Specifically, the plaintiffs argue that "the applicant resubmitted the same plans previously denied by the Commission with a new title block and insignificant adjustments in the final elevations at a few points in the plans. None of the cosmetic changes addressed any of the failings of the previous plan. The `new' plan continues to eliminate the entire knoll on the property in violation of the requirements of the PDD regulations . . . [and] proposes to excavate more than 600,000 cubic yards to `prepare' the site for residential structures that could be more easily constructed along the existing topography." (Plaintiffs' Brief, p. 17.)
The commission counters that it heard specific testimony with regard to the differences between the two applications and decided that the applications were not the same. (Commission's Brief, p. 12.) The commission further argues that the earlier site plan application was not before the commission when it approved the present site plan application and therefore the commission "had absolutely no basis upon which it could have reasonably determined that the 2000 application and the 1994 prior application were the same or substantially the same." (Commission's CT Page 15248 Brief, p. 14.) Finally, the commission argues that the court must defer to the commission's factual determination that the two applications were not substantially the same. "The issue is not whether the court on appeal should find the two applications are the same. The issue is what evidence was before the Commission when it decided the Application, and whether that evidence was sufficient to support the [Commission's decision to approve] the 2000 Application." (Commission's Brief, p. 15.)
"Administrative agencies are impotent to reverse [themselves] unless (1) a change of condition has occurred since its prior decision or (2) other considerations materially affecting the merits of the subject matter have intervened and no vested rights have arisen . . . The principle applies, however, only when the subsequent application seeks substantially the same relief as that sought in the former. . . . It is unnecessary for this court to determine whether the . . . applications sought the same relief. The determination as to whether the application under review is substantially the same as the prior application and that circumstances and conditions have not changed so as to affect materially the merits of the application is for the defendant to determine in the first instance. . . ." Bradley v.Inland Wetlands Agency, 28 Conn. App. 48, 50, 609 A.2d 1043 (1992). "The function of the court on review is not to reach its own conclusions upon subordinate facts but only to determine whether the conclusion of the commission on those facts was unreasonable or illogical." Hoffman v. Kelly,138 Conn. 614, 617, 88 A.2d 382 (1952). "The plaintiff bears the burden of proof to show that there was no change of conditions or circumstances since the prior application." (Citations omitted; internal quotation marks omitted.) Bradley v. Inland Wetlands Agency, supra, 50.
The court must decide, therefore, whether the commission's determination that the two site plan applications were not substantially the same was unreasonable or illogical. As previously noted, the 1994 site plan application also proposed the construction of 36 residential units on the subject property. The commission denied that application because of "the failure of the application to comply with three sections of the Planned Development District (PDD) zone. . . . (1) Section 213-26.5(B)(2). The proposed plan with its elimination of a major natural feature certainly does not comply with the requirement for an application to include `creative design techniques' to integrate the proposed development with adjacent areas; (2) Section 213-26.5(C)(2)(c). The proposal to mine and excavate the entire 100' high hill certainly cannot be considered an accessory use per this Section of the Zoning Regulations; (3) Section 213-26.5(D)(3)(d). The removal of this natural topographical feature cannot be considered a plan to accommodate said feature." (Supp. ROR, Item 66, p. 1.) The commission's decision denying the 1994 site plan application was subsequently upheld in Summitwood Associates Phase IV v.CT Page 15249Planning Commission, Superior Court, judicial district of New Haven, Docket No. CV 95 371972 (June 6, 1996, Booth, J.).
At the June 1, 2000 hearing on the present application, the commission heard extensive evidence on the issue of whether the two applications were substantially the same. Dominick Caruso, the director of planning and zoning enforcement for the city of Meriden, testified: "The fact remains that the current application still proposes to remove some ninety-four-foot ridge and therefore cause the same environmental concerns as in 1995. You're still removing the same amount of material, you're still removing to the same height. This being said, the staff again recommends denial of the project for the same reasons as in 1995, plus the violation of two other sections of the zoning regulations. More specifically, we recommend denial because, one, the proposed plan fails to comply with three sections of the PDD regulations; namely, Section 213-26.5(B)(2), application of creative design techniques to foster attractive, functional, efficient and well-planned developments, which will be aesthetically integrated with the adjacent areas. The proposed plan, with its elimination of major natural features, certainly does not comply with the requirements of an application to include creative design techniques to integrate the proposed development with adjacent areas. . . . B: Section 213-26.5(C) [(2)] (c), earth and rock excavation and removal and/or rock crushing for the preparation of land for permitted uses, accessways and utilities. The proposal to mine and excavate the entire hill or ridge certainly cannot be considered an accessory use per this section of the zoning regulations. The scale of this is just not an accessory scale. C: Section 213-26.5D3D. All structures and roads shall be planned to accommodate existing natural features, including topography and inland wetlands and watercourses. The removal of this natural topographical feature cannot be considered a plan to accommodate the same feature." (ROR, Item #33, pp. 7-8.)
The commission also received a copy of the memorandum of decision upholding the commission's denial of the 1994 site plan application on the same grounds that the commission's staff recommended that the commission deny the present application.[3] (Id., p. 9.)
Attorney William T. Shea appeared before the commission on behalf of the applicant, Community Village, LLC. He argued that Caruso's concerns over the destruction of the ridge were "aesthetic concerns," and that such concerns could not be the basis for denying the application. (Id., p. 23.) Shea conceded, however, that the application called for the elimination of the ridge but stated: "To develop property, you not only — you have to look at a lot of things, and most of them come down to money, and most of them come down to whether or not you can build the kind of units that you want on a particular piece of land. And in this particular case it is my CT Page 15250 client's firm belief that in order to do that, to provide the roads, to provide the necessary utilities, and to provide the place for a building to be set and the parking areas to be set, you've got to take that down." (Id., p. 22.) Shea later asserted: "[I]n order to appropriately build the units that we want to build, to direct them and face them in the manner in which we want to face them, we want to take down that knoll. We're not taking down half the trap rock ridges in Meriden. They're all around us and they're going to stay around us. What we're doing is, we're taking down a knoll. And that's it. Is it part of the trap rock outcropping? It certainly is." (Id., p. 87.) Shea also commented: "We've changed [the buildings.] We've updated them. My client has hired architects to spiff them up. Some of those buildings were done with a different architectural style of a few years ago. And so that's a change." (Id., p. 21.)
Caruso also testified as to the differences between the two plans: "There are differences between these two plans, between the plans that were submitted originally and the 1994 plans. . . . And now, just to let you know what those differences are: The roadway was elevated . . . from 2 and a half feet to six feet basically. In the middle, the roadway was raised six feet and on either end at about 2 and a half feet to get to that area. Some parking areas were raised up to six feet. Some parking areas weren't raised as high. Some open areas were lowered by 3 feet, so some areas were actually lower than the `94 plan. All the buildings were raised. Some buildings were raised two feet, others were raised to be six feet. They raised the bottom of the detention basin by six feet. . . . They raised the sanitary sewer from 1 foot to six feet, and they changed the architectural style on the floor plan . . . The fact remains that the current application still proposes to remove some ninety-four foot ridge and therefore cause the same environmental concerns as in 1995. You're still removing the same amount of material. . . ." (Id., pp 5-7.)
As set forth previously, "[a]dministrative agencies are impotent to reverse [themselves] unless (1) a change of condition has occurred since its prior decision or (2) other considerations materially affecting the merits of the subject matter have intervened and no vested rights have arisen. . . ." Bradley v. Inland Wetlands Agency, supra, 28 Conn. App. 50. "The function of the court on review is not to reach its own conclusions upon subordinate facts but only to determine whether the conclusion of the commission on those facts was unreasonable or illogical." Hoffman v.Kelly, supra, 138 Conn. 617.
Section 213-26.5(D)(3)(d) of the Meriden zoning regulations pertaining to PDDs provides that "[a]ll structures and roads shall be planned to accommodate existing natural features, including topography and inland wetlands and watercourse." In 1995, the previous site plan application for CT Page 15251 the construction of 36 residential units on the subject property was denied by the commission because it proposed the destruction of the same ridge that the present application proposed to eliminate. (ROR, Item #33, pp. 4-8.). In voting to approve the present application, the commission stated: "[Section] 213-26.5(D)(3)(d). All structures and roads shall be planned to accommodate existing natural features, including topography and inland wetlands and watercourses. Removal of this natural topographical feature can be considered a plan to accommodate said features, and that this does conform to PDD." (Id., p. 125.)
The court finds that the commission's conclusion that "removal of this natural topographical feature can be considered a plan to accommodate said feature" is both unreasonable and illogical and represents a reversal of a prior decision where the record supports a finding that there was no material change in conditions to warrant such a reversal.
The commission also denied the 1994 application on the ground that it violated § 213-26.5(C)(2)(c). The commission stated: "The proposal to mine and excavate the entire 100' high hill certainly cannot be considered an accessory use per this Section of the zoning Regulations." (Supp. ROR, Item #66, p. 1.). In upholding the commission's decision, Judge Booth noted: "The commission argues that Summitwood's site plan application violates § 213-25.5(C)(2)(c) of the PDD regulations. The record supports the Commission's conclusion. Section 213-26.5(C)(2) (c) of the Regulations permits as an accessory use earth and rock excavation, and/or rock crushing for the preparation of land for permitted uses, accessways and utilities.' An accessory use is defined in the Regulations as "[a] use incidental to the principal use of a lot or a building located on the same lot.' Meriden Zoning Regulations § 213-7. The Commission does not contest that excavation necessary to prepare property for a permitted use is an accessory use. Rather, the Commission contends that the scope of the proposed excavation establishes that the excavation of rock at the site is the principal use of the land. Foley's report, on which the staff relied in making its recommendation to the Commission, states that the excavation would last at least four to five years; would delay construction of the townhouses for five to six years; would entail removal of 625,000 cubic yards of material; and would require 47,000 truck trips. He reported that the excavation would create a twelve acre impervious tabletop, requiring re-establishment of ground cover and vegetation at a massive additional cost to the developer. . . . Foley asserted that the plan of development, requiring removal of 100 feet of rock from a 12 acre parcel, is consistent with a plan of development for a strip mine. . . . He stated that Summitwood's plan would actually reduce the number of townhouses that could be built on the property. He reported that the units could be constructed easily without removal of the hill CT Page 15252 and he submitted a design alternative in support of his position. . . . As previously set out, the record contains substantial evidence from which the Commission could reasonably conclude that rock excavation was the intended primary use of the property and that such excavation was neither subordinate to construction of the townhouses nor minor in significance."Summitwood Associates Phase IV v. Planning Commission, supra, Superior Court, Docket No. CV 95 371972.
At the June 1, 2000 hearing on the present application, the commission heard evidence on the accessory use issue. Stephen Anderson, attorney for the Scaringes, remarked: "The applicant is proposing to level this hill, remove 600,000 cubic yards of trap rock, just about the same as was proposed in 1994. Minor cosmetic changes have been made to the `94 plans which do not change the applicant's intention to conduct rock excavation as the primary use for the Summitwood property, and such proposed excavation is neither subordinate to construction of town houses nor is it minor in significance." (ROR, Item #33, pp. 45-46.) Anderson also stated: "Mr. Shea describes the need of the builder to build what he needs to build. And I would submit to you . . . that leveling 90 to 100 feet of this hill to sell and remove 600,000 cubic yards of trap rock, merely delays the construction of housing. . . . It's going to take years. It's going to take four or five years before the site is ready for development. . . . As the town planner advised the Commission in its July 8th, 1994 memo, and I quote, `There is no discernible reason to develop this property in the manner proposed.' The current proposal is merely another ruse to extract rock. The commission was not misled when it denied the previous attempt to establish a rock quarry, and the court upheld its denial." (Id., pp. 50-52.)
Terry McCarthy, a professional engineer hired by the Scaringes to review the site plan application, testified as to the quantity of rock to be removed under the plan. He stated: "It's approximately 600,000 cubic yards still. I think the original quantity was 625,000 cubic yards. This is 600,000 cubic yards." (Id., p. 57.) Attorney Shea, representing the applicant, responded: "We haven't done the computations, the rock computations, because that's pretty damned expensive to do. They've done them. Mr. Scaringe has gone out and hired people to do them, and, you know, I think it's very neighborly of him to do that. I mean, I know how much those things cost and I told my client not to do that because we, under our law, are entitled to remove the rock." (Id., pp. 83-84.) In response, Attorney MacManus stated "that last comment made by my colleague, that is, that he has a right to remove the rock. Judge Booth ruled in his memorandum of decision that the excavation proposed had subsumed the project, it had enveloped and literally consumed the project, that it was the primary application and reason for the application, that the buildings had become CT Page 15253 the accessory use, if you will, to the quarrying activity. . . . [T]hat was also one of the reasons why he sustained the decision of this board." (Id., p. 85.)
In 1995, the commission decided that the 1994 application violated the accessory use provision contained in the PDD regulations and denied the application on that basis, which denial was upheld by the court, Booth, J. In approving the present application, the commission stated: "The proposal to mine and excavate the entire 100-foot hill certainly does — can be considered an accessory use per the section of the zoning regulations." (Id., p. 125.) As with its reversal on the requirement that an application accommodate existing natural features, the commission's determination that the present "proposal to mine and excavate the entire 100-foot hill . . . can be considered an accessory use per [§ 213-26.5(C)(2)(c)]" is similarly unreasonable and illogical where the record supports a finding that there has been no material change in either the applicant's proposal or the regulations pertaining thereto.
Finally, the commission denied the 1994 application on the basis that it violated § 213-26.5(B)(2). The commission stated: "The proposed plan with its elimination of a major natural feature certainly does not comply with the requirement for an application to include `creative design techniques' to integrate the proposed development with adjacent areas." (Supp. ROR, Item #66, p. 1.) In approving the present application, the commission stated: "[T]he proposed plan with its elimination of a major natural feature certainly does agree or comply with requirements for an application to include creative design techniques to integrate the proposed development with adjacent areas. . . ." (ROR, Item #33, p. 125.)
This court finds that the commission's determination that the present application complies with § 213-26.5(B)(2) represents a reversal of the commission's 1995 decision when there has been no material change in the regulation or in any of the conditions affecting the application. Accordingly, and for the foregoing reasons, the plaintiffs' appeal of the commission's decision on the ground that it constitutes an improper reversal of a prior decision is sustained. The court, however, also sustains the appeal on several additional grounds.
The plaintiffs also appeal on the ground that the commission's decision violated § 213-26.6(5) of the Meriden zoning regulations, which provides in relevant part: "Prohibited operations and uses in the Ridgeline Setback Areas are building construction, road construction, utility construction, quarrying, clear-cutting of vegetation and cutting of timber within fifty feet of the ridgeline as defined in Section 3.1." (Supp. ROR Item #59, p. 3.) Section 3.1. provides, in turn, that "basalt (traprock) CT Page 15254 ridgeline means the line on a traprock ridge created by all points at the top of a fifty percent slope (2 horizontal for each vertical unit of distance) along Beseck Mountain, Lamentation, Cathole, South Mountains, East/West Peaks, (not Chauncey Peak), which is maintained for a distance of fifty (50) horizontal feet perpendicular to the slope and which consists of surficial basalt geology." (Emphasis added.) (Id., p. 1.)
The commission does not dispute that the subject property falls within the ridgeline setback area. Indeed, § 3.1 expressly includes Cathole Mountain in its provisions. Instead, the commission argues that "the application is exempt from . . . the Ridgeline Protection Zone Regulation . . . by reason of[§ 213-25.5(F)], "which provides that "[se]ction 213-26.5 [750] shall supersede all sections of the Zoning Ordinance of the City of Meriden where they may conflict." (Commission's Brief, p. 18.) Specifically, the commission argues that the PDD regulations conflict with the ridgeline protection zone regulation because they specify "no prohibitions, conditions or requirements" relating to ridgeline protection. (Commission's Brief, p. 19.) The commission concludes that "to read [§ 213-26.5 (F)] in any way except as an exemption provision that applies to . . . the . . . Ridgeline Protection Regulations, would render the entire Regulations an inconsistent body of law." (Id.) As support for its argument, the commission points out that the PDD regulations were readopted after the ridgeline protection regulations were adopted by the city council. The commission reasons that "had the Meriden Common Council intended for the Ridgeline Protection Regulations to supersede the PDD exemption provision instead of vice versa, the Council easily could have changed the language of the exemption provision to make clear that it does not apply to the Ridgeline Protection Regulations." (Id., p. 20.)
The plaintiffs counter that there is no conflict between the PDD regulations and the ridgeline protection zone regulations because "no provision of § 213-26.5 expressly permits excavation operations and uses within fifty feet of a ridgeline that falls within a PDD zone." (Plaintiffs' Revised Reply Brief, p. 8.) Moreover, the plaintiffs argue that § 213-26.5(D)(3)(d) of the PDD regulations requires that all structures and roads be designed to accommodate existing topographical features, which is consistent with the ridgeline protection regulations, not in conflict with them. (Id.) The court agrees.
In interpreting municipal zoning regulations, the court seeks "to discern the intent of the legislative body as manifested in the words of the regulation. . . . The words employed by the local legislative body are to be interpreted in accordance with their natural and usual meaning . . . and any interpretation that would torture the ordinary meaning of CT Page 15255 the words to create ambiguity will be rejected. . . . Common sense must be used in construing the regulation, and [the court] assume[s] that a rational and reasonable result was intended by the local legislative body." (Citations omitted.) Spero v. Zoning Board of Appeals,217 Conn. 435, 441, 586 A.2d 590 (1991). The court when called upon to ascertain the meaning of a zoning regulation must "[w]henever possible . . . [construe it] so that no clause is deemed superfluous, void or insignificant. The regulations must be interpreted so as to reconcile their provisions and make them operative so far as possible. When more than one construction is possible, we adopt the one that renders the enactment effective and workable and reject any that might lead to unreasonable or bizarre results." (Citations omitted.) Planning Zoning Commission v. Gilbert, 208 Conn. 696, 705-706 (1988).
Section 213-25.5(F) of the Meriden zoning regulations provides: "Precedence over inconsistent provisions of the Zoning Ordinance. Section 213-26.5 . . . shall supersede all sections of the Zoning Ordinance of the City of Meriden where they may conflict." (ROR, Item 57.)
When interpreting a local regulation, no clause or phrase should be deemed superfluous or insignificant. Accordingly, the court attaches significance to the phrase "where they may conflict" as a qualifier of the verb supersede and to the words "precedence over inconsistent provisions." In the court's view, the phrase means that where the PDD regulations and the remainder of the zoning ordinance does not conflict, the zoning ordinance provisions govern. The issue, therefore, is whether the ridgeline protection regulation is inconsistent with any section of the PDD regulations.
The commission refers to only one section of the PDD regulations, § 213-26.5(C)(2)(B)(c)(3), as being inconsistent with the ridgeline protection regulation. Section 213-26.5(C)(2)(B)(c) permits, as an accessory use, "earth and rock excavation and removal, and/or rock crushing for the preparation of land for permitted uses, accessways and utilities." The commission reasons that because the construction of thirty-six residential units is a permitted use in the PDD, the excavation and removal of the subject knoll is a permitted accessory use and thus supersedes the ridgeline protection regulation. (Commission's Brief, p. 21.)
The commission's argument fails for two reasons. First, as previously discussed, the commission denied an identical application in 1995 because it violated the requirement of § 213-26.5(D)(3)(d) that "[a]ll structures and roads shall be planned to accommodate existing natural features, including topography and inland wetlands and watercourses." Thus, while residential housing may be a permitted use in the PDD, CT Page 15256 residential housing that does not accommodate the topography and natural features of the land is not. Moreover, "statutes should be construed, where possible, so as to create a rational, coherent and consistent body of law." Waterbury v. Washington, 260 Conn. 506, 557, ___ A.2d ___
(2002). The prohibition of § 213-26.5(D)(3)(d) against the destruction of topographical and other natural features is not only consistent with the ridgeline protection regulation, it is, in the court's view, even more restrictive because it is not limited to basalt traprock ridgelines but, rather, protects all topographical and natural features. The ridgeline protection regulation is also consistent with § 213-26.5(D)(2)(B) of the PDD regulations. That regulation provides, in relevant part, that "[f]or any development within the Planned Development District, a site plan must be reviewed and a certificate of approval must be issued by the Planning Commission in accordance with the requirements and procedures of Article IX, Section 213-55 . . . of the Zoning Regulations prior to the issuance of a building permit." Section 213-55(8) provides, in turn, that "[i]n reviewing a certificate of approval application, the Planning Commission shall take into consideration the health, safety and welfare of the public in general and the immediate neighborhood in particular and may prescribe reasonable conditions and safeguards to ensure the accomplishment of the following general objectives. . . . (8) That the development of the site will preserve sensitive environmental land features, such as steep slopes, wetlands and large rock outcroppings. (Emphasis added.) Accordingly, because no provision of the PDD regulations conflicts with, or is inconsistent with, the ridgeline protection regulation, the plaintiffs' appeal on the ground that the commission's decision violated § 213-26.6(5) is sustained.
At the June 1, 2000 hearing on the application, the commission voted 3-2 that "it is not reasonably likely that 4 Sam's Road proposal will cause unreasonable pollution or impairment of the public trust in a natural resources ridge mountain at issue." (ROR, Item H 33, pp. 106-107.) The Scaringes argue that the uncontroverted evidence in the record demonstrated that the applicant's proposal would unreasonably destroy natural resources and that feasible and prudent alternatives to the applicant's proposal existed. (Scaringes' Brief, p. 18.) The commission argues that "an administrative agency can consider environmental issues raised under a Section 22a-19 intervention only if those issues are within the jurisdictional authority of that agency." (Commission's Brief, p. 8.) The commission reasons that it had no jurisdiction to consider the application's impact on surrounding trees, vegetation or wildlife because such considerations were "beyond the broad scope of the stated objectives of a Planned Development district." (Commission's Brief, p. 9.) Additionally, the commission argues that there was no CT Page 15257 evidence to support the Scaringes' claims that the development would "generate enormous dust, air pollution and noxious fumes" as well as "cause the leaching of pollutants into the groundwater." (Id.)
"[Section] 22a-19 grants standing to intervenors to raise only those environmental concerns that are within the jurisdiction of the particular administrative agency conducting the proceeding into which the party seeks to intervene. . . ." Nizzardo v. State Traffic Commission, 259 Conn. 131,132, 788 A.2d 1158 (2002). "[Section] 22a-19 of the [act], which permits any person, on the filing of a verified pleading, to intervene in any administrative proceeding and to raise therein environmental issues "must be read in connection with the legislation which defines the authority of the particular administrative agency. Section 22a-19 is not intended to expand the jurisdictional authority of an administrative body whenever an intervenor raises environmental issues. Thus, an inland wetland agency islimited to considering only environmental matters which impact on inlandwetlands. Other environmental impacts must be raised before other appropriate administrative bodies, if any, or in their absence by the institution of an independent action pursuant to § 22a-16.'" (Emphasis in original.) Id., quoting Connecticut Fund for the Environment, Inc. v.Stamford, 192 Conn. 247, 250, 470 A.2d 1214 (1984). "Cities, towns and the like have no inherent police power; zoning is an exercise of police power, and cities and towns must operate in zoning matters within the enabling statutory scheme." Frito-lay, Inc. v. Planning ZoningCommission, 206 Conn. 554, 568, 538 A.2d 1039 (1988).
The court must decide, therefore, whether consideration of the environmental impacts of the proposed development on the subject property falls under the jurisdictional authority of the defendant planning commission. The legislation which defines the authority of a local zoning commission is found at General Statues § 8-1 et seq. General Statutes § 8-2 provides, in relevant part: "(a) The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land fortrade, industry, residence or other purposes. . . . Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those CT Page 15258 in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject tostandards set forth in the regulations and to conditions necessary toprotect the public health, safety, convenience and property values." (Emphasis added.)
Section 8-2 makes it clear that a municipal zoning commission has jurisdiction over all land within the municipality and may regulate such land so as "to protect the public health, safety, convenience and property values." Id. Additionally, § 213.60 of the Meriden zoning regulations authorizes the commission to act "whenever the public necessity, convenience or general welfare require the same by the procedures set forth in this section." Finally, § 213-26.5(D)(2)(B) of the PDD regulations themselves provides in relevant part that "[for any development within the Planned Development District, a site plan must be reviewed and a certificate of approval must be issued by the Planning Commission in accordance with the requirements and procedures of Article IX, Section 213-55 . . . of the Zoning Regulations prior to the issuance of a building permit." Section 213-55(8) provides, in turn, that "[i]n reviewing a certificate of approval application, the Planning Commission shall take into consideration the health, safety and welfare of the public in general and the immediate neighborhood in particular and may prescribe reasonable conditions and safeguards to ensure the accomplishment of the following general objectives. . . . (8) That the development of the site will preserve sensitive environmental land features, such as steep slopes, wetlands and large rock outcroppings. . . ." The court finds, accordingly, that the commission had jurisdiction, pursuant to both state statute and local ordinance, to consider the environmental impacts of the proposed land use.
At the June 1, 2000 hearing on the application, Clinton Webb, an environmental consultant with twenty-three years experience, testified as to the environmental impacts of the application. He stated: "[T]his proposed project is definitely part of the trap rock ridge that's known as the west peak/east peak area and the hanging hills formation. And this is — the subarea is specifically known as Cathole Mountain area. And this area consists of the basaltic highlands, and these are trap rock outcroppings and ridges of the central lowland. And that is — those areas are classified as critical habitat by the Connecticut Department of . . . Environmental Protection. . . . And this area is considered as . . . outstanding example of basaltic highland habitat by the DEP. It's highly probable that many CT Page 15259 amphibian, reptiles, birds and small mammals species use this site as habitat. I did a review of the files at the . . . DEP's Natural Resource Center. . . . [I]t maintains a list of all plant and animal species that have been categorizes as state species of special concern, threatened or endangered species. And they have identified six — they have listed as known to exist in the Cathole Mountain area, which includes this knoll, six species. . . . [F]our are plant species. . . . And two animal species. One is the Saw-whet owl and the other is the Jefferson salamander. . . . The Community Village plan as it's currently proposed would just completely eradicate this whole habitat. There would be nothing left to the unique and valuable habitat . . . (ROR, Item H 33, pp. 65-66.) In written comments submitted to the commission, Webb states "of all the species listed above, the Jefferson salamander is one of the most important because it is a state listed species that specifically prefers steep sloped, rocky areas proximate to deciduous or coniferous forest habitat which are the same characteristics as found on the project site. The geographic limit of Jefferson salamanders in Connecticut occur in the vicinity of the trap rock ridges in the Central Connecticut Lowland of the Hanging Hills . . ." (ROR, Item #36, p. 1.)
The record contains no evidence that the proposed development would not have the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state. Nevertheless, the commission voted that "it is not reasonably likely that 4 Sam's Road proposal will cause unreasonable pollution or impairment of the public trust in a natural resource ridge mountain at issue." (ROR, Item #33, pp. 106-107.)
"Judicial review of administrative process is designed to assure that administrative agencies act on evidence which is probative and reliable and act in a manner consistent with the requirements of fundamental fairness. From both perspectives, we are compelled to conclude that a lay commission acts without substantial evidence, and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues such as pollution control, in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view." Feinson v. Conservation Commission, 180 Conn. 421, 429,429 A.2d 910 (1980). "If an administrative agency chooses to rely on its own judgment, it has a responsibility to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the administrative proceedings." Id.
Because there is no indication in the record of any special knowledge CT Page 15260 or experience of the commission members who found that the application was not reasonably likely to cause unreasonable pollution or impairment of the public trust in a natural resource, the Scaringes' appeal of the commission's decision on the ground that the record does not support the commissions's environmental determination is sustained.[4]
For the foregoing reasons, the plaintiffs' appeal is sustained.